**MOBIL OIL CORPORATION, Plaintiff,**

v.

**FILTROL CORPORATION and Texaco Inc., Defendants.**

**Civ. Nos. 64–1572–RJK, 66–1779–RJK.**

United States District Court,
C. D. California.

Sept. 13, 1974.

Order Nov. 5, 1974.

Armstrong & Lloyd, Orville A. Armstrong, Los Angeles, Cal., for plaintiff; Morgan, Finnegan, Durham & Pine, George B. Finnegan, Jr., John A. Diaz, J. Robert Dailey, New York City, of counsel.

Thelan, Marrin, Johnson & Bridges, James M. Radnich, John G. Flett, Los Angeles, Cal., Fish & Neave, William K. Kerr, Herbert F. Schwartz, Eric C. Woglom, William J. Hone, New York City, for defendant Filtrol.

Hulit L. Madinger, New York City, for defendant Texaco.

## MEMORANDUM OF DECISION

KELLEHER, District Judge.

Plaintiff Mobil Oil Corporation (hereinafter "Mobil") filed an original complaint (64–1572) on November 16, 1964, charging defendants Filtrol Corporation (hereinafter "Filtrol" and Texaco Inc. (hereinafter "Texaco") with infringement of United States Letters Patent Nos. 3,140,249 and 3,140,253. Plaintiff Mobil filed a second complaint (66–1779) on November 4, 1966, charging defendants Filtrol and Texaco with infringement of United States Letters Patent No. 3,271,418. By order of November 16, 1966, Civil Nos. 64–1572 and 66–1779 were consolidated. Plaintiff filed a supplemental complaint on January 6, 1969, charging defendants with further infringement of United States Letters Patent Nos. 3,140,249, 3,140,253 and 3,271,418.

Defendants Filtrol and Texaco filed their Answers and Counterclaims to the Complaints as aforesaid on March 31, 1967, and January 27, 1969. The Answers of Filtrol and Texaco, *inter alia,* deny infringement and allege invalidity and unenforceability of each patent. The Counterclaims of Filtrol and Texaco, *inter alia,* seek a declaration of invalidity, non-infringement and unenforceability of each patent. Additionally, Filtrol has counterclaimed for damages and other relief based upon plaintiff's alleged violation of the antitrust laws, and Filtrol has further counterclaimed for relief based upon plaintiff's violation of the law of unfair competition.

Plaintiff's cause of action for infringement and defendants' counterclaims for non-infringement are limited to the following patent claims:

U.S. 3,140,249—Claims 11 and 15;

U.S. 3,140,253—Claim 37;

U.S. 3,271,418—Claims 15, 16, 18, 19 and 24.

Federal jurisdiction and venue are invoked on the following grounds:

This Court has jurisdiction by virtue of Title 28, United States Code, §§ 1338 and 2201.

Venue is properly laid as required by Title 28, United States Code § 1400(b) with respect to Filtrol generally and with respect to Texaco's operations within this District.

Trial of these combined patent infringement actions on the limited issue of patent infringement was held in this Court on January 17–19, 1973, after approximately nine years of protracted pre-trial procedures. Under the order of bifurcation, a later trial on the issue of patent validity was contemplated should the Court determine that any of the three patents here in suit had been infringed.

At trial, both parties raised objections to the introduction of certain evidence. The Court reserved judgment on admissibility until both parties could file written motions to strike objectionable evidence which had been proferred. After the various motions to strike were taken under submission, decision was stayed pending a decision in Mobil Oil Corporation v. W. R. Grace & Company, 367 F. Supp. 207 (D.Conn.1973) which involved a determination of validity of two of the three patents here in suit.

The parties have stipulated, with respect to U.S. Patent Nos. 3,140,249 and 3,140,253, to be bound in No. 64–1572 on the issues of validity and unenforceability (based on alleged misconduct of Mobil's patent solicitors) by the ultimate appellate outcome on those issues as determined by the judgment of the United States District Court for the District of Connecticut in Mobil Oil Corporation v. W. R. Grace & Co., *supra.*

The parties have further stipulated to be bound in Nos. 64–1572 and 66–1779 on the issues of patent enforceability (based on Mobil's patent licensing policies and practices and on Filtrol's antitrust counterclaim) by the ultimate appellate outcome on those issues as determined by the judgment of this Court in Mobil Oil Corporation v. Filtrol Corp. and Texaco Inc., No. 69–633–F.

On February 11, 1974, the Court denied the motions of both parties to strike certain evidence which had been admitted in the January 1973 trial. Post-trial briefs on the issue of infringement were then filed, and the case was taken under submission for decision on the limited issue of infringement.

As noted above, the issues in this case are related to those in two other previously-tried civil actions. The nature of that relationship should be set forth at this point.

In the present consolidated action (Civil Nos. 64–1572–RJK and 66–1779–RJK), plaintiff Mobil charges defendants Filtrol and Texaco with infringement of United States Letters Patent Nos. 3,140,249 (hereinafter 249), 3,140,253 (hereinafter 253) and 3,271,418 (hereinafter 418).

In Mobil Oil Corporation v. W. R. Grace & Company, *supra,* Mobil alleged

that W. R. Grace & Company had infringed the 249 and 253 patents here in suit and a third patent, No. 3,436,357, not involved here. In a memorandum of decision filed November 2, 1973, United States District Judge Clarie held all three patents there in suit to be valid, enforceable and infringed. This judgment has now been appealed to the Second Circuit, and, as indicated above, both parties have stipulated that the ultimate appellate decision on the validity and enforceability of the 249 and 253 patents will be binding in Civil Action 64–1572 before this Court.

In Mobil Oil Corporation v. Filtrol Corporation and Texaco Inc., Civil Action No. 69–633–F (C.D.Cal.1971), Mobil charged Filtrol with infringement of three patents, none of which is at issue in either of the two actions before this Court. This earlier case between these parties is related to the present case in that the challenged products, i. e., Filtrol Grades 700, 800 and 900 are the same in both cases. Thus, defendants earlier argued, in a motion to strike certain evidence proferred here, this Court would be precluded under the doctrine of collateral estoppel from making contrary findings concerning the physical characteristics of those challenged Filtrol products. As indicated above, this Court denied those motions to strike. It is clear that, although the challenged products are concededly identical, the findings in that earlier action can be given no broader effect than in resolution of the issue directly before that Court, to wit, whether those challenged products infringed the three patents there in suit. The only issue litigated between these parties before that Court was whether the patents there in suit were infringed; findings of fact based solely on evidence on that issue can in no way estop this Court from making its own determination based on evidence admitted before this Court on an entirely different issue—infringement of three different patents.

On July 22, 1974, the Court of Appeals for the Ninth Circuit filed its opinion in the above case, upholding the determination of the District Court of non-infringement. The District Court's determination that the patents there involved were valid was reversed on the ground that a determination of validity where there is no infringement is merely deciding a hypothetical case. This reversal follows the traditional rule in this Circuit that "if the patent is not infringed, it should not also be held valid." M.O.S. Corporation v. John I. Haas Co., 375 F.2d 614 (9th Cir. 1967). As indicated above, the parties here have previously stipulated as to the effect of that Court of Appeals decision on these actions pending before this Court.

It should be noted here that although neither of the above two decisions has res judicata or collateral estoppel effect beyond that stipulated by the parties, this Court has given careful consideration to both of these earlier decisions involving determination of these similar patent infringement issues.

The three patents in the present case, 249, 253 and 418, all relate to gas-oil cracking catalysts, as do those patents in the two cases discussed above. Some understanding of oil cracking would be helpful prior to consideration of the specific patent claims here at issue. The extensive recital of the history of petroleum refining in the United States which is contained in the *Grace* opinion, *supra*, 367 F.Supp. at 214, has been of educational value to the Court and, while not any part of the findings here, it has been of assistance in understanding the complexities involved. It is commended for that purpose; the findings which follow herein are more understandable in light thereof.

When gas-oil is pumped from the ground, it is of limited usefulness in its natural state, and various methods have been utilized to separate large and small hydrocarbon molecules for use in various petroleum products. Prior to 1913, these hydrocarbon molecules were separated primarily by simple distillation; the lighter hydrocarbon molecules boiled

off at lower temperatures and were thus separated from the gas-oil. Later, a process was found by which the heavier hydrocarbon molecules could be broken or "cracked" into lighter hydrocarbon molecules such as those found in gasoline or aviation fuel. As is well known, modern technology has found increasingly greater reliance on the lighter hydrocarbon molecule fuels, and there has consequently been much experimentation and effort made to increase the percentage of light hydrocarbons which could be obtained from a given quantity of crude gas-oil.

In 1939–1940, catalytic cracking came into use. The earliest catalysts were a combination of silica-alumina and initially were "fixed-bed" catalysts. Later, however, "moving bed" and "fluid" catalysts were developed, both of the silica-alumina composite. In both moving bed and fluid processes, the catalyst is distributed and circulates throughout the gas-oil during the cracking process. Moving bed catalysts are sometimes referred to as "pellet" or "bead" catalysts and measure about one-tenth of an inch in diameter, while fluid process catalysts are manufactured in powdered or granulated form. The patents here in suit claim a composition which is suitable for both fluid process and moving bed process units.

Prior to 1962, the silica-alumina catalysts which had been developed in 1939–1940 were in general use throughout the industry. Since 1962, however, catalysts containing a crystalline alumino-silicate or zeolite component have rapidly replaced the older silica-alumina catalyst. The three patents involved in the present case are of the newer zeolite component variety. These three patents are closely related in the type of catalyst they define. All three patents describe two-component composite catalysts consisting of a crystalline zeolite component and a non-zeolite matrix component. In each of the three patents, the zeolite is to have an "ordered crystalline structure of interconnecting pores of 6–15 angstroms in diameter. The matrix component within which the zeolite is distributed must be "porous" but may be made of various porous materials. Each of the patents contains some limitation as to the maximum amount of sodium content, but this amount varies from patent to patent. Finally, each of the patents contains some indication of its operating performance by comparison with the previously mentioned silica-alumina catalyst.

The following relevant facts have been admitted by the parties:

1. Plaintiff Mobil is a New York corporation having its principal place of business at 150 East 42nd Street, New York, New York 10017, and a regular and established place of business at 612 S. Flower Street, Los Angeles, California, within this judicial district. As part of Mobil's business, it operates oil refineries in which catalytic cracking units are used to crack petroleum gasoils. At one of its United States refineries, Mobil uses fluid catalytic cracking units. At all of its other United States refineries, Mobil uses moving bed catalytic cracking units. Mobil manufactures and sells synthetic cracking catalysts in the form of beads for use in moving bed catalytic cracking units, and Mobil sells and has manufactured for its own use and for resale, cracking catalysts for use in fluid catalytic cracking units. Mobil does not itself manufacture cracking catalysts for use in fluid cracking units.

2. Defendant Filtrol is a Delaware corporation having its principal, regular and established place of business at 3250 East Washington Boulevard, Los Angeles, California, within this judicial district. In its Los Angeles facility, Filtrol processes clays to produce clay-based catalysts which it sells for use in fluid catalytic cracking units. Filtrol processes clays to produce pelleted catalysts for moving bed catalytic cracking units in its Salt Lake City plant. Filtrol sells its catalysts to various oil refiners.

3. Defendant Texaco is a Delaware corporation having a regular and estab-

lished place of business at Wilmington, California, within this judicial district. Texaco operates oil refineries in which it employs fluid catalytic cracking units to crack petroleum gas-oil. Texaco buys fluid cracking catalysts from Filtrol for use in Texaco's cracking unit located at its Wilmington, California, refinery.

4. U.S. Patent No. 3,140,249, entitled "Catalytic Cracking of Hydrocarbons With a Crystalline Zeolite Catalyst Composite," was issued to plaintiff Mobil on July 7, 1964, on an application of Charles J. Plank and Edward J. Rosinski, which application bore Serial No. 42,284 and was filed on July 12, 1960.

5. U.S. Patent No. 3,140,253, entitled "Catalytic Hydrocarbon Conversion With a Crystalline Zeolite Composite Catalyst," was issued to plaintiff Mobil on July 7, 1964, on an application of Charles J. Plank and Edward J. Rosinski, which application bore Serial No. 364,301 and was filed May 1, 1964. Patent No. 3,140,253 is identified in its specification as a continuation-in-part of the following applications:

| Serial No. | Date of Pendency | Patent No. |
|---|---|---|
| 42,284 | 7/12/60—7/ 7/64 | 3,140,249 |
| 215,272 | 8/ 7/62—5/13/64 | -- |
| 215,291 | 8/ 7/62—5/14/64 | -- |

6. U.S. Patent No. 3,271,418, entitled "Catalytic Conversion of Hydrocarbons with a Crystalline Alumino-Silicate in a Silica-Alumina Matrix" was issued to plaintiff Mobil on September 6, 1966, on an application of Charles J. Plank and Edward J. Rosinski, which application bore Serial No. 466,096 and was filed June 22, 1965. Patent No. 3,271,418 is identified in its specification as a continuation-in-part of the following applications, among others:

| Serial No. | Date of Pendency | Patent No. |
|---|---|---|
| 42,284 | 7/12/60— 7/ 7/64 | 3,140,249 |
| 159,626 | 12/15/61— 8/21/65 | -- |
| 161,237 | 12/21/61—11/ 9/65 | -- |
| 210,215 | 7/16/62— 9/13/65 | -- |

7. Plaintiff is and always has been the owner of the entire right, title and interest in and to Patents 3,140,249, 3,140,253 and 3,271,418, and in and to all of the earlier filed applications referred to herein.

8. Defendant Filtrol makes, sells and offers for sale the allegedly-infringing catalyst products in this judicial district. The allegedly-infringing catalyst products have been used by Filtrol's customers in the United States.

9. Plaintiff gave notice to defendants of the alleged infringement of:
 (a) U.S. Patents 3,140,249 and 3,140,253 as early as November 16, 1964; and
 (b) U.S. Patent 3,271,418 as early as November 4, 1966.

10. Since the issuance of each of the patents in suit to January 1969, the filing date of the supplemental complaint herein, defendant Filtrol made and sold in varying quantities petroleum cracking catalysts known as Filtrol Grades 700, 800, 810 and 900.

11. Filtrol began commercially marketing its Grade 800 catalyst in January of 1964 and has continuously marketed its Grade 800 catalyst since that date to the date of the filing of the supplemental complaint herein. Filtrol first commercially marketed its Grades 700 and 900 catalysts in early 1967 and has continuously marketed its Grades 700 and 900 catalysts since that date to the date of filing of the supplemental complaint herein.

12. Filtrol's Grades 700, 800 and 900 catalysts have been sold in fine granular form suitable for use in fluid type catalytic cracking units. Limited quantities of Filtrol's Grade 810 catalyst have been sold in pellet form suitable for use in moving bed type catalytic cracking units.

13. The Filtrol products identified as Grades 700, 800, 810 and 900 have, during the entire period of their production and sale by defendant, been sold to petroleum refiners. At the time of such manufacture and sale, representatives of Filtrol believed that the petroleum refiners intended to use Grades 700, 800 and 900 in catalytic cracking units of the FCC or fluid type and Grade 810 in cat-

alytic cracking units of the moving bed type.

14. For some years prior to Filtrol's marketing of its Grades 700, 800, 810 and 900 catalysts, Filtrol produced and sold its Grade 100 (fine granular form) for use in FCC or fluid type cracking units and 110 (pellet form) for use in moving bed cracking units. The Grades 100 and 110 catalysts are prepared from two ingredients, one called SR Fines and the other hydrated alumina.

15. Filtrol's SR Fines ingredient was at all times prepared by treating halloysite clay with acid.

16. Halloysite is an alumino-silicate clay mineral belonging to the kaolin family of clay materials.

17. The Filtrol Grades 700, 800, 810 and 900 catalysts have at all times relevant herein been prepared from the following three ingredients:

(a) SR Fines;

(b) hydrated alumina; and

(c) a material called MR or MRK

The SR Fines and hydrated alumina ingredients have been utilized in the same, or approximately the same, proportion to each other to produce Filtrol Grades 100 and 110 catalysts and Filtrol Grades 700, 800, 810 and 900 catalysts.

18. The MR ingredient was, until about mid-1966, prepared from a material called MASX which had been prepared from a material called NASX. After about mid-1966, the MRK was prepared from a material called MASK. MASK was prepared from a material alternatively called SYN–K or K.

19. Generally, in the process used by Filtrol commercially, prior to about mid-1966, to prepare MR, the starting materials were acid treated halloysite clay (SR Fines), sodium silicate, sodium hydroxide and water.

(a) NASX—The above starting materials were mixed together. The mixture was allowed to stand at ambient temperature for 16 to 24 hours and then heated to 170° to 190° F. for 27 hours to 32 hours, following which the solids, called NASX (or NX), were washed with water to remove liquid (mother liquor).

(b) MASX—The washed NASX was then treated with a solution of magnesium sulfate. The resulting MASX material contained sodium and magnesium cations.

(c) MR—The MASX was then treated with a solution of rare earth metal salt (sulfate). Sometimes the rare earth treated MASX was treated also with an ammonium sulfate solution. The resulting MR material contained sodium, magnesium and rare earth cations, and when ammonium sulfate treatment was used, ammonium cations.

(d) The resulting MR was mixed with SR Fines, hydrated alumina and water, and dried, to form Filtrol Grade 800 catalyst in fine granular form. To form Filtrol Grade 810 (pellet form) catalyst, the resulting MR was mixed with SR Fines, hydrated alumina, water, wood flour and Grade 800 Fines, and extruded, dried and calcined.

20. Generally, in the process used by Filtrol commercially after about mid-1966 to prepare MRK, the starting materials were calcined SR Fines, or Georgia metakaolin clay, sodium silicate, sodium hydroxide, water, salt and ice.

(a) In making K (also called SYN–K), the above starting materials were mixed together. The mixture was allowed to stand at ambient temperature for about 2 to 6 days and then heated to about 190° F. for about 28 hours, following which the solids, called SYN–K or K, were washed with water to remove liquid (mother liquor).

(b) In making MRK, K was treated with a solution of magnesium sulfate. The resulting material

(sometimes called MASK) contained sodium and magnesium cations.

(c) The MASK was then further treated with a solution of rare earth metal salt (sulphate). Sometimes the rare earth treated MASK was treated also with an ammonium sulfate solution. The resulting MRK material contained sodium, magnesium and rare earth cations, and when ammonium sulfate treatment was used, the MRK also contained ammonium cations.

(d) The resulting MRK was mixed with SR Fines, hydrated alumina and water, and dried, to form the Filtrol Grades 700, 800 and 900 catalysts (all fine granular form). To form Filtrol Grade 810 (pellet form) catalyst, the resulting MRK was mixed with SR Fines, hydrated, alumina, water, wood flour and Grade 800 Fines, and extruded, dried and calcined.

21. Between the dates of issuance of each of the patents in suit, to January 1969, the date of filing of the supplemental complaint herein, Filtrol Grades 800 and 900 have been purchased by Texaco from Filtrol and have been used by Texaco to crack hydrocarbon feedstock at its fluid cracking unit located at Wilmington, California, within this judicial district.

22. As part of its business, plaintiff operates a complex of oil refineries in the United States, including one in Torrance, California.

23. Defendant Filtrol's primary business is the manufacture and sale of petroleum gas-oil cracking catalysts.

24. Defendant Texaco, like plaintiff Mobil, operates a complex of oil refineries in the United States, including one in Wilmington, California.

25. One essential characteristic of a commercial cracking catalyst is its ability to withstand the steaming and regeneration conditions to which it is periodically exposed during the catalytic cracking operation. The ability of a cracking catalyst to withstand periodic steam stripping and regeneration without impairment of its ability to catalyze the main cracking process when it is returned to the conversion zone is referred to by those skilled in the art as "stability."

26. Since steaming has been found to be the most effective way of removing entrained oil from the spent catalyst prior to thermal regeneration with air, and since steam is encountered in the seals and kiln of commercial catalytic cracking units, and is frequently used to purge the catalyst of air following regeneration, good steam stability is essential if a catalyst is to be used in modern commercial catalytic cracking equipment.

27. In the cracking operation carried out in the cracking zone, coke and other undesired products such as dry gas, are formed at the expense of useful products. The ability of a catalyst to convert high boiling hydrocarbons to lower boiling hydrocarbons of whatever nature is referred to in the art as the "activity" of the catalyst. Activity by itself, however, may not be advantageous. For example, a highly active catalyst which converts a large portion of the hydrocarbons present in the gas-oil undesirable products, such as dry gas and coke, is wasteful and unsuitable for use in commercial catalytic cracking units.

28. Crystalline alumino-silicate zeolites are usually synthesized in such a manner as to produce a zeolite with sodium cations. Each sodium cation $(Na+)$ has one positive electrical charge and electrically balances one aluminum-centered tetrahedron. These sodium cations may be replaced, by a process known as "base exchange," with other positively charged cations of metals such as calcium $(Ca+++)$, magnesium $(Mg++)$, rare earth [e. g., cerium $(Ce+++)$ and lanthanum $(La+++)$], or non-metals, including ammonium $(Nh_4+)$ and hydrogen $(H+)$. Sodium, ammonium and hydro-

gen are monovalent cations; calcium and magnesium are divalent cations; and cerium and lanthanum are trivalent cations.

29. Chemical analyses show that the crystalline zeolites vary with respect to their chemical composition. One criterion for distinguishing among the compositions of various crystalline alumina-silicate zeolites is the silica to alumina mole ratio, or the "$SiO_2/Al_2O_3$" ratio. This is computed by comparing the amount of silicon plus oxygen to the amount of aluminum plus oxygen in the zeolite. For zeolite X the $SiO_2/Al_2O_3$ ratio varies from 2 to 3, and for zeolite Y the $SiO_2/Al_3O_2$ ratio is greater than 3, to about 6.

30. In March 1962, at the time it commenced the commercial use of its new composite catalyst Durabead-5, Mobil released news of the new catalyst development to the press.

31. X-ray powder diffraction is a procedure used to study crystalline materials. Equipment and procedures for carrying out x-ray diffraction analyses of crystalline materials have been known in the art since 1950.

32. Filtrol's business, for at least the last two decades, has included the processing of clays to produce fluid and moving bed cracking catalysts. In the 1940's Filtrol made its powdered clay catalysts for fluid units and its pelleted clay catalysts for moving bed units by acid-treating montmorillonite clay. In early 1950 Filtrol developed what it called its SR (sulphur-resistant) catalyst from halloysite clay, and in about 1955 Filtrol developed a line of composite catalysts consisting of two ingredients, SR clay and alumina. The fluid version of this composite catalyst was known as Grade 100 and the pelleted moving bed version was known as Grade 110. Filtrol still sells an appreciable quantity of Grade 110, and a small amount of Grade 100 along with its earlier clay catalysts. None of these Filtrol catalysts is asserted to infringe any of the Mobil patent claims in suit.

33. The only other producer in recent times of catalysts made from clay alone has been Houdry. Until very recently, Filtrol has been the only company in the catalyst field to produce both fluid and moving bed catalysts.

34. In early 1962, Filtrol heard rumors about Mobil's bead-type synthetic moving bed catalyst, which was reported to contain both molecular sieves and rare earths. At that time, Filtrol decided to learn more about molecular sieves. Upon determining that molecular sieves were crystalline alumino-silicates composed principally of silica, alumina and soda, Filtrol decided to try to make molecular sieves by processing clay, which is composed of silica and alumina. Filtrol eventually succeeded in processing clay to yield materials which had x-ray diffraction patterns similar to the molecular sieves known as zeolite A and zeolite X.

35. Filtrol's current Grade 800 zeolite-containing catalysts are prepared from K, the name given by Filtrol to its Y-type zeolite. In the middle of 1964, Filtrol began to investigate the preparation of a Y-type zeolite by processing clay.

36. Filtrol succeeded in making K on a plant scale by processing clay. It then utilized this zeolite in precisely the same way as it had utilized NASX to continue making Grade 800 catalyst. The K zeolite component is treated with rare earths and magnesium and sometimes ammonium to produce what is referred to by Filtrol as MRK. The MRK is then mixed with the other ingredients (SR clay and alumina) to prepare composite catalysts. In November 1966, Filtrol switched all of its zeolite-containing catalyst production from MR to MRK.

37. In April of 1964, shortly after the introduction of Grade 800, Filtrol added to its line of catalysts Grade 810, a pelleted zeolite-containing cracking catalyst for moving bed units.

38. Filtrol's pelleted moving bed zeolite-containing catalyst Grade 810 turned out to be an unsuccessful product. Fil-

trol's production of Grade 810 zeolite-containing catalyst ceased in January 1968; none has been sold since April 1968, and there are still about 250 tons of Grade 810 in inventory at Filtrol. Filtrol's zeolite-containing catalysts for fluid cracking units have been highly successful. In addition to Grade 800, Filtrol has also commercialized what it calls Grades 700 and 900, and the only difference among these three grades is the amount of zeolite ingredient contained in them. Filtrol sold 178,000 tons of zeolite-containing fluid catalyst (Grades 700, 800, and 900) during the period 1964 through 1969.

39. In March 1964, Haney, Filtrol's then vice-president, informed Texaco about Filtrol's new Grade 800 fluid cracking catalyst. Soon thereafter Texaco ordered some Filtrol Grade 800.

40. The first Texaco order of Grade 800 was shipped by Filtrol to Texaco's Wilmington, California, refinery in July 1964. Texaco continued to purchase Filtrol 800 for use in Texaco's Wilmington refinery until around 1967. At that time, Texaco switched to Filtrol Grade 900 which had more zeolite in it than Grade 800. The fluid catalytic cracking unit operated by Texaco in its Wilmington, California, refinery is the same one which had been in operation since 1944 and which had used non-zeolite containing catalysts prior to the introduction of Filtrol 800.

## THE PATENTS IN SUIT

### A. *The 249 Patent*

The 249 patent, entitled "Catalytic Cracking of Hydrocarbons With A Crystalline Zeolite Catalyst Composite," was issued July 7, 1964, on application Serial No. 42,284, filed July 12, 1960, by Charles J. Plank and Edward J. Rosin-ski. This patent describes gas-oil cracking catalysts which are a composition of a crystalline zeolite mixed with a non-zeolite material referred to in the patent as a "matrix." The 249 patent teaches that zeolite-containing catalysts can be used in both moving bed and fluid bed gas-oil cracking units (7/13–33 [hereinafter abbreviation for Column 7, lines 13 through 33 of the patent referred to]) and the procedures for making both the fluid and moving bed types of catalyst are described therein (7/2–13). The zeolites to be used in the catalysts of the 249 patent are those which have a pore diameter of 6 to 15 angstrom units (4/58–61). Zeolites X and Y have such pore diameters and the preparation of both X and Y zeolites is taught at 4/63–5/44. The 249 patent refers to the non-zeolite portion of the catalyst as the "matrix" (4/2; 7/40–43) and teaches that the matrix may contain inorganic oxides such as alumina gel and clay (4/2–6; 2/66). Finally, the 249 patent teaches that the overall sodium content of the composite catalyst should be less than 1 weight percent (8/43–48).

Mobil alleges that Filtrol's catalyst Grades 700, 800 and 900, as used by Texaco, infringe claims 11 and 15 of the 249 patent. Both are process claims which recite processes for gas-oil cracking which are dependent upon other composition claims.

### *Claim 11 of the 249 Patent*

Claim 11 of the 249 patent [1] recites a process for cracking by contacting a hydrocarbon charge (gas-oil) with the catalyst composition described in claim 9. Claim 9 of the 249 patent [2], on which claim 11 is dependent, describes a catalytic composition comprising a finely divided crystalline zeolite of described structure suspended in and distributed

---

1. 11. A process for cracking a hydrocarbon charge which comprises contacting said charge under catalytic cracking conditions with the catalytic composition of claim 9.

2. 9. A catalytic composition comprising a finely divided crystalline alumino-silicate hav-ing a structure of rigid three dimensional networks characterized by uniform pores suspended in and distributed throughout an inorganic oxide matrix, which composition has a sodium content of less than 1 weight percent.

throughout an inorganic oxide matrix. Claim 9 further recites that the catalyst composition have a sodium content of less than about 1 weight percent overall.

On this claim, Mobil introduced evidence at trial that:

(a) defendants' catalysts contain less than 1 weight percent sodium overall;

(b) defendants' zeolite is suspended in and distributed throughout the matrix;

(c) defendants' matrix constitutes clay and alumina, both of which are inorganic oxides;

(d) defendants' zeolite is finely divided and is a crystalline aluminosilicate having a structure of rigid three-dimensional networks characterized by uniform pores; and

(e) Filtrol's catalysts Grades 700, 800 and 900 are used by Texaco and other refiners in their catalytic cracking units wherein they are contacted with gas-oil under catalytic cracking conditions.

*Claim 15 of the 249 Patent*

Claim 15 of the 249 patent[3] also recites a process for cracking a hydrocarbon charge (gas-oil) by contacting that charge under catalytic cracking conditions with the catalyst of claim 14.

Claim 14[4], on which claim 15 depends, describes a catalytic composition comprising a finely divided crystalline zeolite of described structure suspended in and distributed throughout spheroidal particles of inorganic oxide gel. Claim 14 also requires that the catalyst contain less than 1 weight percent sodium overall.

On this claim, Mobil introduced evidence at trial that:

(a) defendants' catalysts contain less than 1 weight percent sodium overall;

(b) defendants' zeolite is suspended in and distributed throughout spheroidal catalyst particles containing inorganic oxide gel, i. e., alumina gel;

(c) defendants' zeolite is finely divided and is a crystalline aluminosilicate having a structure of rigid three-dimensional networks characterized by uniform pores; and

(d) Filtrol's catalysts Grades 700, 800 and 900 are used by Texaco and other refiners in their catalytic cracking units wherein they are contacted with gas-oil under catalytic cracking conditions.

■ In determining whether the challenged products infringe the above claims, the Court has been urged by plaintiff to "resort . . . in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Mfg. Co. v. Linde Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). If the Court were to apply only the above test to the present case, it would be unnecessary to proceed further with this analysis. The Court is not unmindful, however, that this simplistic approach to complex issues such as those here present is perilous. The Court is at least encouraged by the law of this Circuit to look beyond the letter of the claims to see if the challenged product, although falling within the literal words of the claim, may nevertheless perform in such a sub-

3. 15. A process for cracking a hydrocarbon charge which comprises contacting said charge under catalytic cracking conditions with the catalytic composition of claim 14.

4. 14. A catalytic composition comprising finely divided crystalline alumino-silicate having a structure of rigid three dimensional networks characterized by uniform pores suspended in and distributed throughout spheroidal particles of inorganic oxide gel, which composition has a sodium content of less than about 1 weight percent.

stantially different way so as to not infringe the patent. Bowser, Inc. v. Filters, Inc., 396 F.2d 296 (9th Cir. 1968). Consideration must therefore be given not only to the specific language of the above claims but to the claims in the light of the specifications and examples provided in the patents. We must then compare the performance of the challenged products with that taught by the patents.

*The Zeolite Component*

The 249 patent teaches that both X and Y type zeolites are used in the composite catalysts. Plaintiffs, through the testimony of Rosinski and Smith, have shown that Filtrol uses only X or Y zeolites in the accused catalyst.

Defendants acknowledge that there is no dispute that the Filtrol zeolite *ingredient*, which is combined with other ingredients to make the composite catalyst, is the Y-type zeolite before its combination with other ingredients. It is also admitted by defendants that this Y-type zeolite had the patent's requisite "rigid 3-dimensional networks characterized by uniform pores." Defendants assert, however, that it is much disputed whether the zeolite *component* after it becomes part of the composite catalyst continues to have the same structural characteristics which are taught by the patent. In addition, defendants argue that the evidence before the Court on this issue does not include any *direct* measurement of the characteristics of the zeolite component in the composite catalyst, but rather consists only of x-ray diffraction patterns and testimony that these patterns indicate "a structure of rigid three-dimensional networks." Mobil replies to the above argument by including a quotation from Dr. Smith's testimony to the effect that "the zeolite component in Filtrol's catalyst is a crystalline alumino-silicate whose structure was a rigid three-dimensional network characterized by uniform pores." This is in fact the type of zeolite component as taught by the 249 patent.

Defendants' argument seems to be that Mobil has failed to meet its burden of proving the nature of the structure of the zeolite component of the Filtrol catalyst. Considering the testimony of Dr. Smith on this issue, the Court finds that: (1) Dr. Smith is highly qualified to testify as to what information can be derived from x-ray diffraction of compounds, and defendants have been unsuccessful in their efforts to impeach or deny his testimony; (2) x-ray diffraction patterns are widely acknowledged as reliable indicators of the crystalline structure of chemical compounds; (3) using this x-ray diffraction technique, Dr. Smith has successfully demonstrated that the Filtrol zeolite is identical in all respects to the Y-type zeolites taught in the patents.

The suggestion which defendants make, but which is not persuasive to the Court, is that there is a longer, more elaborate technique of chemical analysis which could prove more conclusively the exact nature of the zeolite component. X-ray diffraction, by contrast, requires a person trained in the art to make certain inferences from the diffraction patterns. Although defendants argue that these inferences do not satisfy the burden placed on Mobil, they have failed to impeach Dr. Smith's unequivocal testimony on this issue. From that testimony, the Court is satisfied and makes no requirement that plaintiff produce the type of detailed analysis which defendants demand. Defendants have introduced no evidence and have not otherwise brought into doubt the propriety, utility or accuracy of x-ray diffraction as a method of identification of crystalline compositions. The Court therefore finds that plaintiffs have established by a preponderance of the evidence that the zeolite component as found in Filtrol's composition catalyst is substantially identical with that taught in the 249 patent.

*Non-zeolite Component*

The 249 patent refers to the non-zeolite portion of the catalyst as the matrix

and teaches that the matrix *may* contain inorganic oxides (including alumina or clay) or inorganic oxide gel (i. e., alumina gel). Mobil contends that defendants' catalysts have always contained both alumina and clay and alumina gel in the matrix.

Defendants argue that claim 11, which refers to "an inorganic oxide matrix," when read with claim 15, which includes an "inorganic oxide gel," must be considered in light of the specifications to read an "inorganic oxide gel matrix" limitation; that since Mobil has not proved that defendants' catalysts have inorganic oxide gel matrices, there is no infringement.

Mobil replies to this argument by noting that Filtrol is thus attempting to "rewrite" the specific claims of the patent so as to avoid including the challenged product. Further, Mobil addresses this argument by pointing to uncontested and unrebutted testimony of Mr. Rosinski to the effect that the challenged catalysts do in fact have "an inorganic oxide matrix" and also contain "an inorganic oxide gel."

The Court finds that the claims of the patent clearly do not read literally as defendants argue they should read.

Defendants introduce two items of evidence in support of their contention that the claims should be read otherwise. Neither is persuasive. Defendants offer both the testimony of plaintiff's witness, Dr. Hawthorne, in Judge Ferguson's court, and Judge Ferguson's findings of fact on a similar issue in his court. As both parties have stipulated to the introduction of testimony taken in that prior proceeding as evidence in the present case, the Court has considered that testimony with the full force and effect as if it were given in this proceeding. This Court has also carefully considered the reported findings of fact which were made in that previous proceeding, although, as indicated earlier, this Court cannot be bound by those findings which were made after proof of the entirely different issues before that Court. Considering all of the above, this Court believes that there was considerable confusion in these prior findings as to the definition of "matrix." Although this confusion involves some detail, it generally centered around the problem that "matrix" could actually refer to either a combination of a number of separate ingredients *or* a single ingredient when used loosely and generally, but must include more than one ingredient if read narrowly and technically. Unfortunately, the experts testifying before Judge Ferguson appeared to vacillate between the narrow technical and the general usages. Although this appears to have produced some confusion on this issue in that action, this Court is not convinced it is of such moment as to require rewriting these two claims as defendants assert.

In conclusion, Mobil has established by a preponderance of the evidence that the non-zeolite component of defendants' catalyst is included in the teachings of claims 11 and 15 of the 249 patent.

*Sodium Content*

The 249 patent teaches that the finished catalyst should contain less than one weight percent sodium. Defendants' catalyst contains less than one weight percent sodium. On this point, defendants do not argue that the sodium of this completed catalyst is without the patent claims. Rather, they argue that in light of the specifications, the patent claims must be read to indicate that the sodium content of the zeolite component must itself be less than one weight percent. This assertion is based on several items in the patent specifications which discuss the advantages of using low sodium zeolite and also discuss various processes by which the sodium in the zeolite may be reduced to these required levels. Filtrol asserts that its own catalysts are made with "high-sodium" zeolites and thus do not infringe the 249 patent.

In the final analysis, defendants' argument must be found without merit. Although defendants are correct in that the specifications do discuss removing

sodium from the zeolite component, the patent claims themselves could not be clearer. They state unequivocally that "which composition [the zeolite *and* the matrix] has a sodium content of less than one weight percent." (249 patent claims 9–11–14–15) There is no mention in the claims themselves of the sodium limitation on the zeolite component. Moreover, claims 19 and 21 of the 249 patent do include a "substantially sodium-free" zeolite limitation. As these claims are *not* asserted against the Filtrol catalyst, it would be reversible error for the Court to read these claim limitations into those claims which are asserted. Since the specifications refer to all of the claims of the patent, the Court cannot read a limitation of one claim onto another claim through a more general specification. Finally, it is common knowledge in the industry that catalysts require low sodium to be effective. It is also common knowledge that there are various ways (primarily base-exchanging of ions through washing in other metallic solutions) to eliminate sodium from a catalyst. This base exchange may be performed either on the zeolite component or on the combination catalyst with similar results, i. e., sodium content is decreased. Although Mobil base exchanges the zeolite prior to combination with the matrix, the base exchange following such combination should be considered an equivalent of this process. Thus, even if the claims did indicate that the zeolite should contain low sodium content (they clearly do not), there would still be a legitimate question of whether the patent is infringed by an equivalent process which results in an identical final product. Infringement may not here be avoided by merely reversing or otherwise varying the steps in the process when the same result is accomplished in substantially the same way.

The Court therefore finds that Mobil's patent claims limit only the sodium content in the entire *composition* catalyst. There is no limitation as to sodium content of the zeolite, and defendants do not avoid infringement by their use of high sodium zeolites. The sodium content of the challenged composition catalyst falls within the sodium content taught by the claims here asserted as being infringed.

### The Shape of the Catalyst Particles

The 249 patent teaches that the zeolite and non-zeolite components be intimately admixed during manufacture and that this procedure results in having the zeolite particles suspended in and distributed throughout the non-zeolite material (5/45–66). During manufacture, Filtrol intimately admixes its zeolite and non-zeolite components and defendants' zeolite is suspended in and distributed throughout the non-zeolite material.

The 249 patent also teaches that "spheroidal" catalyst particles are obtained by spray drying (6/74–7/6). Filtrol has always spray dried its catalysts to produce spheroidal catalyst particles, and there does not appear to be any dispute between the parties on this point.

### Use of the Finished Catalysts

The 249 patent teaches the preparation and use of the zeolite-containing catalysts disclosed therein for the fluid cracking process (7/2–22). Filtrol has manufactured its catalysts Grades 700, 800 and 900 exclusively for use in the fluid process and Texaco has so used them.

Having thus considered the claims, specifications and examples of the 249 patent, and all evidence introduced both in interpretation of that patent and in description of the challenged products, the Court finds that Filtrol Grades 700, 800 and 900 infringe claims 11 and 15 of the 249 patent.

### B. *The 253 Patent*

The 253 patent is entitled "Catalytic Hydrocarbon Conversion With A Crystalline Zeolite Composite Catalyst," and issued on the same day as the 249 patent, i. e., July 7, 1964. The 253 patent is based in part on application Serial

No. 42,284, filed July 12, 1960, in the names of Charles J. Plank and Edward J. Rosinski (41/10).

Whereas the composite catalysts described and claimed in the 249 patent contain a zeolite which may have a variety of types of cations associated with it, the 253 patent requires that the cations associated with the zeolite include at least both rare earth and ammonium cations. According to the 253 patent, such a combination of cations associated with the zeolite is brought about by base exchanging or washing with rare earth and ammonium (2/22–28). Because of the "stability" imparting effect of the rare earth and ammonium cations, the catalysts of the 253 patent may contain up to four weight percent sodium overall (10/9–14; 11/45–58).

The 253 patent teaches that both X and Y zeolites may be used to practice the invention (6/49–50) and that such zeolites may be produced by caustic treatment of clay (8/68 et seq.). Preferred matrix (non-zeolite) materials include gels (10/37–44) and clay (10/31) and both moving bed and fluid forms of the catalyst are taught (11/59–62).

Mobil charges that Filtrol catalyst Grades 700, 800 and 900 infringe claim 37 of the 253 patent.

### Claim 37 of the 253 Patent

Claim 37 of the 253 patent [5] describes a catalyst composition comprising a porous matrix and a crystalline aluminosilicate having an ordered crystalline structure and having associated therewith both rare earth ions and hydrogen ions or hydrogen precursors, e. g., ammonium ions. Claim 37 further recites that the finished catalyst contains less than four weight percent sodium overall.

On this claim, Mobil introduced evidence at trial that:

(a) defendants' catalysts contain less than four weight percent sodium overall;

(b) defendants' catalysts contain a porous matrix, i. e., Filtrol's silica-alumina type catalyst called Grade 100; and

(c) defendants' catalysts contain a crystalline alumino-silicate having an ordered crystalline structure and having associated therewith both rare earth and hydrogen precursor, i. e., ammonium cations.

As noted above, the primary difference between the 253 patent and the 249 patent is that the former teaches base exchanging or washing with rare earth and ammonium cations and that this results in having both rare earth and ammonium cations associated with the zeolite (2/23–29). Base exchange or washing may occur before or after, as well as before and after admixture of the zeolite and non-zeolite materials (9/29–41). Mobil charges that defendants' base exchange or wash with rare earth and ammonium cations and defendants' zeolite has both rare earth and ammonium cations associated with it.

Defendants have strongly denied that their catalyst falls within the above rare earth and ammonium cation limitation. Specifically, defendants argue that the challenged catalyst, in addition to containing rare earth and ammonium cations, also contains magnesium cations. Although claim 37 of the 253 patent does not indicate that the rare earth or ammonium cations are exclusive, defendants argue that this claim, when read in light of the specifications and a 251 patent (not here in suit) which includes

---

5. 37. A catalyst composition comprising a porous matrix and a crystalline alumino-silicate having an ordered crystalline structure and having associated therewith both rare earth cations and positive ions selected from the group consisting of hydrogen, hydrogen precursors and mixtures thereof, said compositions having a sodium content of less than about 4 weight percent.

magnesium cations, must be read to exclude magnesium cations from claim 37 of the 253 patent. In reply, Mobil points out that the very language of the specification indicates that if other metallic cations are included in the composition, magnesium cations are preferred. With regard to defendants' double patenting exclusion argument concerning Mobil patent 251, Mobil notes that as a matter of law, the double patenting argument is not applicable to those patents issued and expiring on the same date.

Considering all of the above, the Court cannot read claim 37 of the 253 patent so as to exclude magnesium cations; Filtrol cannot successfully avoid infringement on this point.

Defendants also directly dispute the fact that ammonium cations are associated with its zeolite or that such cations are obtained through base exchange with ammonium prior to composition. This is because Filtrol does not now "base exchange" in the technical sense its zeolite or its catalyst with any ammonium salt solution. (Defendants' exhibit DO; Secor Tr. 1898–1899; DX–SK; Kahn Tr. 1993–1994). Rather, from the diagram in plaintiff's exhibit PX–144, it can be seen that ammonia is mixed with the clay as part of the matrix solution prior to mixing with the zeolite to form the catalyst. This accomplishes the same result as base exchanging the zeolite prior to composition in that the composite catalyst ends up having associated with it the ammonium cations as taught by claim 37 of the 253 patent.

The question for the Court is thus whether this slightly different method of catalyst preparation is sufficient to avoid infringement. In making this determination, reference should be made to the specific language of claim 37: "a catalyst *composition* comprising porous matrix and a crystalline alumino-silicate having an ordered crystalline structure and *having associated therewith* both rare earth cations and positive ions selected from the group consisting of hydrogen, hydrogen precursors, [ammonium] and mixtures thereof . . ."

The language of this claim clearly indicates that the requirement is only that the "composition" have the requisite ions or cations, and not, as Filtrol argues, that the zeolite itself have such cations. Although the specifications indicate that this "composition" may be obtained by base exchanging the zeolite prior to admixing with the matrix, the present Filtrol process of mixing the ammonia with the clay prior to composition with the zeolite is considered by the Court to be equivalent to the earlier base exchange process. Infringement is not thus avoided merely by Filtrol's associating the ammonium cations at some different point in the process. Infringement may not be avoided by reversal or alteration of steps in a process, and the Court here finds that Filtrol's manufacturing process, although somewhat different from Mobil's manufacturing process and that taught in the specifications of the 253 patent, is substantially equivalent. This determination is particularly appropriate in this case where the claim asserted is not a process claim but a composition claim. The Court thus finds that the challenged products infringe claim 37 of the 253 patent.

Inasmuch as the parties have acknowledged, and the Court finds that the teachings of 253 are not substantially different from those of 249 with regard to zeolite structure, non-zeolite compound, sodium content (except that higher sodium is allowed), shape of particles, and use of the finished catalysts, the Court will not repetitively discuss each of these factors here. The Court finds, however, that with regard to each of these factors, the challenged products do not differ from the 253 patent so significantly as to avoid infringement.

*The 418 Patent*

The 418 patent, entitled "Catalytic Conversion of Hydrocarbon With A Crystalline Alumino-Silicate In A Silica-Alumina Matrix," issued September 6, 1966. It too is based in part on the

application of Charles J. Plank and Edward J. Rosinski, Serial No. 42,284, filed July 12, 1960 (1/12–24; 1/67–68).

The 418 patent teaches: (1) that the non-zeolite portion of the composite catalyst be catalytically active (4/46–50); (2) that the zeolite be more catalytically active (4/45–46); 4/50–72); and (3) that the zeolite be present in an amount not more than 25 weight percent (8/33–38; 18/41). As taught at 43/65–70, the use of a catalytically active matrix results in the production of a higher octane gasoline.

As stated at 7/71–73, both X and Y zeolites have the faujasite structure and are particularly preferred for use in the practice of the 418 patent (7/73–8/24). The X and Y zeolites may be made by caustic treatment of clay (7/62–65; 7/73–74). The preferred matrix or non-zeolite materials are acid treated clay (9/16; 10/38), gel (9/15; 9/18) or a combination of clay and gel. Both moving bed and fluid forms of the catalyst are taught at 12/29–30.

The overall sodium content of the 418 catalysts should be less than four percent and preferably less than one percent by weight based on the total composition (10/26–30).

Mobil charges that the same Filtrol catalysts Grades 700, 800 and 900 infringe claims 15, 16, 18, 19 and 24 of the 418 patent.

*Claim 15 of the 418 Patent*

Claim 15 of the 418 patent [6] describes a catalytic composition comprising not more than 25 percent of a finely divided crystalline zeolite of described structure suspended in and distributed throughout a major portion of a porous matrix. Claim 15 further states that the catalyst contains less than about four weight percent sodium overall and that, under prescribed conditions, the zeolite and matrix possess the recited catalytic activities.

On this claim, Mobil introduced evidence at trial that:

(a) defendants' catalysts contain less than 25 percent by weight zeolite;

(b) defendants' catalysts contain less than 4 weight percent sodium overall;

(c) defendants' catalysts contain a major portion of porous non-zeolite or matrix material;

(d) defendants' zeolite is suspended in and distributed throughout the non-zeolite or matrix material;

(e) defendants' zeolite has a substantial catalytic activity under the prescribed test conditions;

(f) defendants' matrix is less active than the zeolite and possesses more than the described minimum catalytic activity; and

(g) defendants' zeolite is finely divided and is a crystalline alumino-silicate having a structure of rigid three-dimensional networks characterized by a system of cavities with interconnecting pore openings having minimum diameters of greater than 6 Angstroms and less than 15 Angstroms, the cavities being connected with each other in three dimensions by said pore openings.

6. 15. A catalytic composition comprising a minor proportion not exceeding about 25 percent by weight of a finely divided crystalline alumino-silicate having a structure of rigid three-dimensional networks characterized by a system of cavities with interconnecting pore openings having minimum diameters of greater than 6 Angstroms and less than 15 Angstroms, the cavities being connected with each other in three dimensions by said pore openings, suspended in and distributed throughout a major portion of a porous matrix material, which composition has a sodium content of less than about 4 weight percent, said crystalline alumino-silicate exhibiting substantial catalytic activity for the conversion of hydrocarbons, and said porous matrix material likewise exhibiting a lesser, but substantial catalytic activity capable of effecting at least 15 percent conversion of Mid-Continent gas oil having a boiling range of 450° F. to 950° F. at a liquid hourly space velocity of 2, a catalyst to oil volume ratio of 3, a temperature of 900° F. at substantially atmospheric pressure.

*Claim 16 of the 418 Patent*

Claim 16 of the 418 patent [7] is similar to claim 15 except that it describes a catalytic composition having a sodium content of less than one percent by weight overall. Like claim 15 it specifies a major portion of a porous matrix and not more than about 25 percent by weight of a finely divided crystalline zeolite of described structure, the zeolite being intermixed with the matrix. Claim 16 further states that, under prescribed conditions, the zeolite and matrix possess the recited catalytic activities.

On this claim, Mobil introduced evidence at trial that:

(a) defendants' catalysts have an overall sodium content of less than one percent by weight;

(b) defendants' catalysts contain a major portion of a porous matrix;

(c) defendants' matrix possesses more than the recited minimum catalytic activity;

(d) defendants' zeolite is finely divided and present in an amount less than 25 percent by weight;

(e) defendants' zeolite is intermixed with the matrix;

(f) the catalytic activity of defendants' zeolite is substantially greater than that of the matrix under the recited test conditions; and

(g) defendants' zeolite possesses the described structure.

*Claim 18 of the 418 Patent*

Claim 18 of the 418 patent [8] is dependent on claim 16 and further recites that the matrix may contain chemically treated clay. Defendants admit that the non-zeolite or matrix portion of their catalysts contains chemically treated clay.

*Claim 19 of the 418 Patent*

Claim 19 of the 418 patent [9] is also dependent on claim 16 and further recites that the zeolite be derived from caustic treated clay. Defendants admit producing their zeolite by the caustic treatment of clay.

*Claim 24 of the 418 Patent*

Claim 24 of the 418 patent [10] is also dependent on claim 16 and further recites that the zeolite have the crystallographic structure of faujasite.

At trial, Mobil introduced evidence that defendants use zeolites X and Y which have the crystallographic structure of faujasite.

*Relative Catalytic Activity of the Zeolite and Matrix*

The 418 patent differs from the 253 patent primarily in its teachings concerning the non-zeolite matrix of the catalyst. Specifically, the 418 patent

[7]. 16. A catalytic composition characterized by:
 (a) a sodium content of less than 1 percent by weight;
 (b) a major proportion of a porous matrix material capable, as a catalyst, of effecting at least 15 percent conversion of Mid-Continent gas oil having a boiling range of 450° to 950° F. at a liquid hourly space velocity of 2, a catalyst to oil volume ratio of 3, a temperature of 900° F. at substantially atmospheric pressure;
 (c) not more than about 25 percent by weight of a finely divided crystalline alumino-silicate having a structure of rigid three-dimensional networks characterized by a system of cavities with interconnecting pore openings having minimum diameters of greater than 6 Angstroms and less than 15 Angstroms, the cavities being connected with each other in three dimensions by said pore openings, said crystalline alumino-silicate being intermixed with said matrix material; and
 (d) said crystalline alumino-silicate having a catalytic activity substantially greater than that of said matrix material.

[8]. 18. The catalytic composition of claim 16, wherein the porous matrix material comprises a member selected from the group consisting of natural clay, chemically treated clay and thermally treated clay.

[9]. 19. The catalytic composition of claim 16, wherein the crystalline alumino-silicate is derived from caustic treated clay.

[10]. 24. The catalytic composition of claim 16, wherein the crystalline alumino-silicate comprises a material having the crystallographic structure of faujasite.

teaches that the matrix be catalytically active and that the zeolite be more highly active. The 418 patent further teaches that the catalytically active zeolite is obtained by base exchanging or washing with rare earth, magnesium and ammonium. Mobil has introduced evidence to show that Filtrol washes with rare earth, magnesium and ammonium.

In addition, Mobil has introduced the results of gas-oil cracking tests which purport to establish that the zeolite and matrix of defendants' catalysts possess the relative catalytic activities of the 418 claims and demonstrate that:

(a) defendants' base exchanged zeolite exhibits a substantial catalytic activity for the conversion of hydrocarbons;

(b) the activity of defendants' base exchanged zeolite is substantially greater than that of the matrix; and

(c) defendants' matrix is capable of effecting at least 15 percent conversion of Mid-Continent gas-oil having a boiling range of 450° F. to 950° F. at a liquid hourly space velocity of two, a catalyst to oil volume ratio of three, a temperature of 900° F. at substantially atmospheric pressure.

Filtrol does not dispute Mobil's assertions concerning the catalytic activity of its matrix material. Rather, Filtrol argues that the catalytic activity of this matrix would not be greater than that of the zeolite with which it is combined under testing conditions in which the zeolite is steamed: "Mobil made no tests on Filtrol's composite catalyst, either before or after steaming. Mobil failed to carry its burden of proving that the zeolite components embodied in Filtrol's catalyst, after the steam treatment required by the 418 patent, are even as active as Filtrol's Grade 100 catalyst, which is the matrix . . . ." (Defendants' brief at 36)

Mobil replies to the above contentions by noting that none of the claims of the 418 patent even mentions steaming, and to include a steaming requirement would be to rewrite the claims of the patent. Mobil further points out that the assert-ed claims of the 418 patent specify the precise testing conditions under which these relative catalytic activities are to be measured, and that the evidence has shown that Filtrol's catalyst, when tested under these precise testing conditions, gives the requisite catalytic activity which infringes those claims.

This dispute concerning the relative catalytic activity of the zeolite to the matrix is very much related to the contentions discussed above regarding (1) sodium content, and (2) the association of ammonium cations. This is because high sodium content without ammonium cations associated will cause a catalyst to lose substantially all of its catalytic activity upon steaming. The simple solution to this problem is merely to decrease the sodium content of the catalyst prior to its use and also (as taught by 253 and 418) to associate ammonium cations for increased stability under steaming. (Steaming is often used in testing to simulate conditions under which a catalyst would be operating in a refinery.)

The claims of the three challenged products all speak in terms of composition catalysts which have low sodium *and* ammonium cations. These catalysts would thus be stable to steaming. It appears, however, that Mobil achieves this result in its catalyst manufacturing process by treatment of the zeolite (which is initially high in sodium content) prior to admixing in the catalyst composition. Filtrol, on the other hand, seems to prefer a method which involves treatment of the finished catalyst to eliminate the sodium and associate ammonium with the catalyst. Thus, Filtrol is correct that prior to composition in the catalyst, its zeolite is quite unstable to steam. If the zeolite is steamed and then tested, the catalytic activity would be lower than that of the matrix. Because the claims of the 418 patent require that the matrix have a substantially lower catalytic activity than the zeolite, Filtrol argues that its product does not infringe the 418 patent.

Looking only to the claims of the patent and the testing conditions specified therein, it is clear that there is no requirement of steaming before the relative catalytic activities are compared, and the Court is not convinced that a requirement of steaming should be read into these claims before relative catalytic activity is measured. Absent steaming, the Filtrol products show the same relative catalytic activity (i. e., zeolite more active than matrix) taught by the above claims of the 418 patent. The Court must thus find that the challenged Filtrol products infringe claims 15, 16, 18, 19 and 24 of the 418 patent.

Since the parties have acknowledged and the Court finds that the teachings of 418 are not substantially different from those of 249 and 253 with regard to zeolite structure, sodium content (except that higher sodium is allowed), shape of particles, and use of the finished catalysts, the Court will not repetitively discuss each of these factors here. The Court finds, however, that with regard to each of these factors, the challenged products do not differ from the 418 patent so significantly as to avoid infringement.

*Performance Characteristics*

As noted earlier, the law requires that this Court consider, in addition to the claims of the patent, the principal of operation and the performance characteristics of the challenged products. This is because a challenged product may be found to fall within the literal words of the claim but may perform in such a substantially different way so as to avoid infringement.

Each of these three patents, after teaching the chemical composition of the catalysts, sets forth certain performance characteristics in various operating examples. These examples prescribe certain conditions under which the performance of the patented catalysts may be compared with that of the previously widely used silica-alumina catalysts.

Through plaintiff's exhibits 91, 87A, 111A, and 87C, and through the testimony of plaintiff's witness Rosinski, Mobil has shown that when the challenged products are tested, their performance is substantially identical to that indicated in the operating examples of the three patents. Thus, when compared to older silica-alumina catalysts, both patented and challenged products show approximately the same increase in percentage of gasoline produced and approximately the same decrease in percentages of waste products, dry gas and coke. Mobil has thus shown that not only do the challenged products achieve the same results as the patents, but they do it by being more efficient in exactly the same respects. Although substantial identity of results would not alone be sufficient evidence to make out a claim of infringement, identity of performance is evidence of infringement when the identical performance is obtained, as here, in substantially the same way.

These identical performance characteristics can be vividly seen by considering plaintiff's exhibit 87C, which compares one of the challenged Filtrol catalysts as used by Texaco with example 50 of the 253 patent. Using the older silica-alumina catalyst as a standard of comparison, it can be noted that whereas the 253 example indicates an increase in gasoline production of 18.5 percent, the Filtrol catalyst indicates an increase of 19 percent. Where 253 indicates a decrease in dry gas waste of 27.5 percent the Filtrol catalyst reduces dry gas waste by 28 percent. Finally, where 253 indicates a decrease in coke waste of 58 percent, the challenged catalyst indicates a decrease in coke waste of 56 percent.

Although substantial identity of results, performance or function is not in and of itself sufficient to show infringement, such extensive identity of performance in the several different respects indicated above is an important factor which must be considered by the Court. The Court thus finds that the performance characteristics of the challenged products gives positive support to the Court's earlier determinations that

each of these three patents has been infringed.

*Willful and Deliberate Infringement*

The issue as to the willfulness or deliberateness of defendants' infringement is not as technical as any of the foregoing infringement issues and therefore need not be discussed here in great detail. Mobil's contentions are essentially that after the issuance of the 249 and 253 patents in July of 1964, Filtrol was furnished copies of those patents and offered a license thereunder. Because Filtrol neither purchased a license nor ceased manufacture of its catalyst, Mobil claims that the infringement has been both willful and deliberate.

Mobil argues that: (1) a defendant must exercise due care to ascertain whether it is infringing a patent; (2) that courts have found infringement to be willful where defendants know of the patent but nevertheless continue without advice of counsel to manufacture an alleged infringer; and (3) that the failure of Filtrol to get an opinion of counsel as to whether their catalysts infringe the 249 and 253 catalysts indicates that their infringement was not in good faith.

The Court does not find any of these arguments persuasive in the light of the history of this case and the complexities and subtle differences between the patents and the challenged products. Mobil has not established that Filtrol had any great or detailed knowledge concerning the Mobil patents prior to their issue in July of 1964. Mobil must also concede that Filtrol actually started commercial production of the product challenged here in January of 1964 and that the development of Filtrol's catalyst was totally independent of information concerning the Mobil patents. The facts indicate that Mobil made a press announcement in 1962 concerning its new catalyst and from this Filtrol learned that this new Mobil catalyst contained zeolites. Based on this information, Filtrol's independent research eventually resulted in a catalyst which this Court

has now determined infringes Mobil's patents. As indicated earlier in the discussion of infringement, there are in fact several differences between the patent and the challenged products, with the ultimate question for the Court being whether these differences are so substantial as to allow defendants to avoid infringement.

 Although this Court finds that the challenged products do infringe the patents, the uncertainty in this particular area of technology is highlighted by a consideration that Judge Ferguson of this district found that the products challenged here did not infringe three other similar patents, while Judge Clarie in the *Grace* case in Connecticut found that other similar challenged products manufactured by W. R. Grace & Co. did infringe two of the patents there (and here) in suit. These are clearly close factual questions upon which reasonable men may differ. Given these circumstances and uncertainties, this Court cannot find that Filtrol's infringement has been willful and deliberate merely because Filtrol knew of the Mobil patents and failed to obtain an opinion of counsel as to whether their product infringed.

Mobil also asserts that Texaco, who only began to purchase Filtrol catalysts after the patents here in suit issued, is also guilty of willful infringement. This is likewise based on an assertion that Texaco had knowledge of the patents here in suit and even demanded a "hold-harmless" clause in all contracts of catalyst purchase with Filtrol. Again, given the uncertainties herein indicated, this Court cannot find that infringement by either Filtrol or Texaco has been willful.

SUMMARY

The Court has found, after careful consideration of the patents and all evidence presented at trial, that Filtrol catalysts Grades 700, 800 and 900, as used by Texaco, infringe United States Letters Patent Nos. 3,140,249; 3,140,253; and 3,271,418. This determination is

based upon the foregoing findings of fact that: (1) each of the accused catalysts shows substantially identical performance advantages as do the patented compositions; (2) with the exception of one or two processes which the Court has found to be equivalent, the accused catalysts are manufactured in the same manner as taught by the specifications of the patents in suit; (3) the accused catalysts have substantially the same properties as those of the catalysts taught by the patents; (4) each of the accused catalysts and their infringing use is within the description and requirements of each of the respective claims of the respective patents, that is, each of the accused catalysts infringes claims 11 and 15 of the 249 patent, claim 37 of the 253 patent, and claims 15, 16, 18, 19 and 24 of the 418 patent; and (5) each of the accused catalysts is used in cracking gas-oil to produce gasoline in substantially the same way as taught in the patents.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and of the subject matter of this action. 28 U.S.C. §§ 1338, 2201. Venue is proper. 28 U.S.C. § 1400(b).

(2) Plaintiff Mobil Oil Corporation is the owner of Plank and Rosinski United States Letters Patent Nos. 3,140,249, 3,140,253 and 3,271,418.

(3) Charles J. Plank and Edward J. Rosinski are the original and first inventors of the subject matter disclosed and claimed in United States Letters Patent Nos. 3,140,249, 3,140,253 and 3,271,418.

(4) Defendants have infringed claims 11 and 15 of Plank and Rosinski United States Letters Patent No. 3,410,249; claim 37 of Plank and Rosinski United States Letters Patent No. 3,140,253; and claims 15, 16, 18, 19 and 24 of Plank and Rosinski United States Letters Patent No. 3,271,418.

(5) The accused catalyst compositions embody the substance of the inventions of the patents in suit. The accused catalysts perform in substantially the same way to obtain the same results as the patented compositions and therefore infringe.

(6) The accused catalysts fall clearly within the words of the asserted claims and therefore infringe.

(7) The accused catalysts function in substantially the same manner to attain the same results as the patented catalysts and therefore are complete equivalents of the patented catalysts.

This Memorandum of Decision shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.

The parties are granted leave to file for the Court's consideration, not later than October 2, 1974, objections, proposed changes or additions to the findings of fact and conclusions of law herein set forth.

A status conference will be held in this case on October 22, 1974, at 9:30 a. m., for the purpose of considering the present status of the case and of setting down for trial the remaining issues.

## ORDER

KELLEHER, District Judge.

Defendants having filed their Proposed Addition And Objection To The Court's Findings Of Fact And Conclusions Of Law and plaintiff having filed its Opposition thereto and the aforesaid matter having come on for hearing before this Court on October 29, 1974, and this Court having heard argument and ruled thereon,

Therefore, it is ordered:

1. That conclusion of law No. (3) be and the same hereby is stricken from the Memorandum Of Decision of this Court dated September 12, 1974; and,

2. That defendants' Proposed Addition requesting certification for appeal of two questions under 28 U.S.C. § 1292(b) be and the same hereby is denied in all respects.